**Arne & Dorothy AMALIKSEN, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 99–6L.

United States Court of Federal Claims.

Jan. 21, 2003.

Cecilia Fex, Washington, D.C., for plaintiffs. Nels Ackerson, of counsel.

Kristine S. Tardiff, with whom was Acting Assistant Attorney General Thomas L. Sansonetti, Washington, D.C., for defendant.

## OPINION AS AMENDED *

BRUGGINK, Judge.

This is an action alleging a Fifth Amendment, uncompensated taking of land previously burdened by an abandoned railroad easement. Pending are cross motions for summary judgment with respect to the claims of some of the plaintiffs. The single issue is whether the selected plaintiffs (Claimants 1 through 6) are owners of the fee interest. Oral argument was held on July 17 and July 26, 2002. For the reasons set out below, we find that plaintiffs do not own land underlying any portion of the easement and thus cannot maintain takings claims.

## BACKGROUND

The lands at issue in this litigation are located very near the Canadian border in Orleans County, Vermont. Our decision today involves six parcels of property, owned on the date of the alleged taking by Charles Alexander, Elizabeth Dunbar, Anthony and Toni–Jo Wikar, Aurele and Gilberte Breton, Gordon and Hildegard Alexander, and John and Mae Keane (collectively "plaintiffs"). They are generally situated on the east side of Lake Memphremagog. The practical issue presented is whether they are merely near the lake or actually front on it. The answer depends on what happened to the land underlying the easement at issue.

Plaintiffs have a common predecessor-in-title, Luther Kittridge, who acquired fee simple absolute title to approximately 176 acres of land, including plaintiffs' parcels, in 1854. The parcel bordered Lake Memphremagog. On October 1, 1863, the Connecticut and Passumpsic Rivers Railroad ("CPRR") line acquired a right-of-way across the land owned by Kittridge through a "Commissioner's Award." The easement followed the eastern edge of the lake, running roughly north-south. Kittridge retained the fee interest. In May, 1867, CPRR opened a segment, historically known as the "Beebe Subdivision" or the "Beebe Spur," extending from Newport, Vermont, north to the state's border with Canada. This segment ran along the easement over Kittridge's property.

From the southern border of Kittridge's property, moving along Lake Memphremagog to its northern border, the width of CPRR's easement varied as follows: (1) the first 1,700 feet of the easement was two rods (thirty-three feet) on either side of the center; (2) the next 700 feet, consisting of the six parcels at issue today, was two rods from the center line on the right (east), extended to Lake Memphremagog on the left (west); (3) the next 1,300 feet was two rods on the right, 1.5 rods on the left (or lake side) of the center line; and (4) the final 2,000 feet was two rods on either side of the center line. Plaintiffs' parcels abut the unique portion of the easement that widens toward the west to

---

* This opinion was originally issued July 31, 2002. The court granted plaintiff's unopposed motion to clarify the record regarding the availability of certification to the Vermont Supreme Court. Accordingly, the Court has removed the footnote which indicated that the Vermont Supreme Court did not have a method for certification of questions of state law.

front on the lake. That portion of the easement will be referred to throughout this opinion as the "lake parcel."

The Kittridge Commissioners' Award does not indicate why CPRR acquired more than the typical fifty-eight or sixty-six foot right-of-way along the 700 foot stretch at issue. However, a 1914 right-of-way map prepared by CPRR is instructive. That map identifies the 700 foot stretch as "Lake Park," the location of a "Flag Stop" and a train platform. Plaintiffs assert, and the government does not deny, that none of these things were built and that the right-of-way was not put to such use.

On March 5, 1867, Kittridge's estate conveyed all of the land acquired by him in 1854 to John and Alvin House. Plaintiffs contend that the outcome here turns on the construction of the two succeeding deeds. In the first, dated August 21, 1867, the Houses conveyed fee simple to approximately fifty-five acres of the land they had acquired from the Kittridge estate to Albert S. Miller. The grant was described as follows:

> Beginning at a point in the highway leading from Glines Corner in Stenstead to West Derby Vermont about eighteen rods north of Land formerly owned and occupied by Simon Brooks and so as running west a parallel line with South Line of said lot shall touch the center of a certain cherry tree Standing about fifteen rods from said highway in the filed thence in the same direction parallel with the south line of said lot *to the Rail Road,* thence in a southerly direction *along the enclosure of said Rail road* to the land formerly owned by the said Brooks.... Meaning to convey to the said Millers all the land deeded to us

the fifth day of March A.D. 1867 by Portius Kittridge, Administrator of the Estate of the late Luther Kittridge contained within the bounds above described being *East of said Rail Road* and south of said Cherry Tree—Supposed to contain about fifty five acres of land be it the same more or less.

(Emphasis supplied). In this deed, the Houses retained the right to cross the land conveyed to Miller in order to access the lands they retained on the west side of the railroad: "The understanding between the parties is that J.L. & A. House is to have a pass action across the land and here deeded convenient to occupy the land on the point— west of the Rail Road belonging to them."

The second deed is dated May 7, 1868, a year after this segment of CPRR's line was opened for operation. On that date, Alvin House conveyed approximately fifteen acres of land acquired from the Kittridge estate to CPRR. This land was described as follows:

> Being all that part of the land bought of Portius Kittridge Administrator of the Estate of the late Luther Kittridge by John S. House & Alvin House & conveyed to them on the fifth day of March A.D. 1867 which lays *west of the Rail Road to the lake* and between Johns River on the north and southern line of said purchase from the said Kittridge supposed to contain about fifteen acres more or less.

(Emphasis added). The parties agree that this deed conveyed fee simple absolute title to CPRR to *something.* The issue becomes, "what?" The court drawing below indicates the approximate locations of the various parcels in relation to the railroad and the lake.

Two questions have to be answered in considering these grants. The first is, "did the 1867 deed give the Millers ownership of any portion of the land underlying the easement?" The second is similar: "Did the 1868 grant to the railroad include any portion of land already encumbered by the easement?" Before attempting to answer those questions, we will bring the chronology to the present.

On November 26, 1880, Albert S. Miller conveyed the land he had acquired from the Houses to Francis House. Following a series of mesne conveyances between 1880 and 1935, this same land was conveyed on November 15, 1935, from George O. Burtin to Harry Hanson and his wife, Lillian Hanson.

In the early 1950's, the Hansons divided their land into a number of smaller lots resulting in the parcels at issue in Claims one through six. The Hansons conveyed these parcels to plaintiffs or their predecessors-in-title between 1954 and 1969. It is noteworthy, and defendant asserts, dispositive, that the most recent deeds to these plaintiffs clearly convey only land east of the ease-

ment. For example, the Alexander deed refers to land "running southerly on the easterly right-of-way" of the railroad. The other current deeds are to the same effect. The more particular question then becomes, "does a proper construction of the prior deeds, in light of other facts and certain presumptions under Vermont law, dictate that the plaintiffs nevertheless own land under all or a portion of the right-of-way?"

The history concerning the railroad is also relevant. CPRR submitted to the Interstate Commerce Commission ("ICC") a "Right-of-Way and Track Map" ("Valuation Map") dated June 30, 1914, and a corresponding schedule of "Lands Owned or Used For Purposes of a Common Carrier" ("Land Schedule"), dated March 26, 1918. Plaintiffs contend, and the government does not dispute, that this map attributes the railroad's interest in land in the area of the right-of-way in the area in question only to the easement.

In 1926, CPRR leased a portion of its railroad that included the Beebe Spur to Canadian Pacific Railway Company ("CP").

CP purchased this portion in 1946. In 1995, CP filed a "verified petition for exemption" with the ICC under 49 U.S.C. § 10505 (1994), seeking exemption from the abandonment requirements of 49 U.S.C. §§ 10903 and 10904 to effectuate regulatory abandonment of the Beebe Spur. In 1996, all of CP's interest in the Beebe Spur was "railbanked" under federal law and then conveyed to the state of Vermont by the execution and recording of a quitclaim deed.

The claim presented by these plaintiffs and others in this suit is that, when the railroad ceased operating, the easement it utilized was abandoned, and, to the extent the railroad did not own the underlying fee, their remaining fee interest is now unencumbered by any easement. The introduction of a recreational trail under the Rails to Trails Act allegedly constitutes a taking of a new easement.

## DISCUSSION

Establishing title to the property allegedly taken is essential in asserting a taking. In this case, plaintiffs claim ownership of all the land underlying the entire railroad right-of-way-in other words, all the land from the eastern portion of the right-of-way to the lake. Alternatively, they claim just the land on the eastern side of the centerline of the right of way. Defendant disputes both assertions. Both parties agree that the matter is subject to Vermont law.

Plaintiffs' preferred result-ownership of the entire right-of-way-is reached through the following analysis. The 1867 deed to plaintiffs' predecessors was unclear, hence it passed title to the eastern half of the right-of-way. The 1868 deed to the railroad was equally unclear. Under the presumption that abutting owners take to the center line, plaintiffs' predecessors and the railroad split the easement in the stretches of land above and below the lake parcel. With respect to the lake parcel, however, there was no adjoining landowner west of plaintiffs, thus there was no one with whom to "split" the easement. Hence by operation of law plaintiffs took to the western edge of the easement, i.e., the lake.

Defendant disagrees with plaintiff on the all points. At the outset, it views the modern deeds, which purport only to convey land east of the easement, as controlling, irrespective of prior grants. In the alternative, it contends that the chain of title coming through the Millers was limited to a specific grant only to the land east of the eastern edge of the right-of-way. Defendant also takes a different view as to plaintiffs' argument that the railroad obtained no fee interest in any land west of the center line of the right-of-way in the lake parcel. At a minimum, the area west of the center line, including virtually all of the lake parcel, belonged to the railroad in fee, according to the government. In defendant's view, if there was a "gore" or unclaimed strip, it would only be the area east of the center line in the lake parcel, and that should revert to the railroad as in the dominant House chain of title. Finally, the government contends that under no conditions would any of the easement default to the plaintiffs, as their chain of title is incompatible with "appending" any portion of the disputed land under the easement. For the reasons set out below, we agree with defendant on all points.

■ What ownership interest do plaintiffs hold? When assessing a deed's particular language, we must accept its plain meaning and "not look to construction aids if the language is not ambiguous." *Kipp v. Estate of Chips*, 169 Vt. 102, 732 A.2d 127, 131 (1999). If we find ambiguity in the particular language, we must examine the instrument in its entirety in an attempt to "determine the intent of the drafters from all of the language and using relevant construction aids." *Id.*; *see also Fairbrother v. Adams*, 135 Vt. 428, 378 A.2d 102, 104 (1977) ("If the wording of the deed is ambiguous, resort may be made to subordinate rules of construction, although such rules are not given the status of positive law."); *Sheldon Slate Prod. Co. v. Kurjiaka*, 124 Vt. 261, 204 A.2d 99, 103 (1964) (holding that the parties' intention-not the language employed by them-controls and that "to ascertain the intention it is proper to look at the surrounding circumstances existing when the deed containing the language in question was made, the situation of the parties, and

the subject matter to which such language relates.").

■ In Vermont, "[p]ublic roads and highways, also railroads, are regarded as having three lines: the center line, which is usually the line surveyed when the road is laid out, and on each side of which the road is laid; the two side lines, at equal distances from the center line, and between which lies the territory covered by the road." *Maynard v. Weeks*, 41 Vt. 617, 1868 WL 3512 (1869). In the case of owners of land abutting a highway or railroad:

> the legal presumption, in the absence of evidence showing the fact to be otherwise, is, that such landowner owns to the middle of the highway; and when one conveys land abutting on a highway in which he owns the fee, the law presumes that he intended to convey to the middle of the highway, and will give the deed such effect, unless the language used by the grantor in his deed shows a clear intent to limit the grantee to the side of the highway.

*Elliott v. Jenkins*, 69 Vt. 134, 37 A. 272, 273–74 (1896); *see also, e.g., Dessureau v. Maurice Mem'ls, Inc.*, 132 Vt. 350, 318 A.2d 652, 653 (1974). In *Marsh v. Burt*, 34 Vt. 289, 1861 WL 3403 (Vt.1861), the court characterized the presumption as follows: "in all cases where general terms are used in a deed, such as 'to a highway' or 'upon a highway' or 'along a highway,' the law presumes the parties intended the conveyance to be to the middle or centre line." 34 Vt. 289 (quoting *Newhall v. Ireson*, 62 Mass. (8 Cush.) 595 (Mass.1851)).

■ Application of the presumption thus hinges on the precise language used. It can be overcome, depending on the drafters' intent. The reason is clear. Land should "not pass as a mere appurtenance to other land; and, consequently, no portion of [a] highway, or stream, will be conveyed, unless the instrument of conveyance can, by reasonable construction, be made to include it." *Cole v. Haynes*, 22 Vt. 588, 1849 WL 2226 (Vt.1849); *accord Buck v. Squiers*, 22 Vt. 484, 1850 WL 2170 (Vt.1850) ("[I]t would be absurd to allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted by

precise and definite boundaries.") (quoting *Jackson v. Hathaway*, 15 Johns 447 (N.Y.Sup.Ct.1818)).

Plaintiffs urge the court to begin the analysis back to front, that is, looking first at the House to Miller deed. We disagree. We believe the beginning point to be the modern deeds to these particular plaintiffs. Here is where we encounter the real problem. Under any reading, these deeds specifically exclude the right of way. On the face of things, therefore, plaintiffs cannot assert the presumption to include to the center line. The language of the current deeds is too clear.

Plaintiffs' argument, as we understand it, is that the modern deeds must be viewed in a larger context, one that includes the earlier deeds and valuation maps showing ownership attribution. We will consider the merits of these arguments below. The court's view, however, is that it is inappropriate, in view of the clarity of the current deeds, to invoke any interpretive aids such as the presumption that grantors intend to include to the center line.

■ If we assume, however, that the penultimate owner's intent must be construed in the context of prior deeds, the result is the same. We thus turn to the 1867 deed to the Millers, which plaintiffs rely on to move the east half of the center line out of the House chain of title. This conveyance, the first division of the 176–acre parcel originally owned by Kittridge, conveyed fee title to a parcel described as running "to the Rail Road, thence in a southerly direction along the enclosure of said Rail Road" and as "contained within the bounds above described being East of said Rail Road."

Admittedly this deed is less clear cut than the modern ones. Determining its intent requires an examination of similar deeds by the Vermont courts. In *Cole v. Haynes*, the court interpreted a document conveying a parcel of land described as

> Beginning at the north west corner of a piece of land owned by Joshua Haynes, at a notch in the fence on the east side of the road leading to Hubbell's falls; thence south eighty six degrees east, on said Haynes' line, three chains; thence north

nineteen degrees west, on said Haynes' line, three chains seventy five links, to the road; thence south thirty three degrees west, *on the line of the road,* three chains and fifteen links; thence south six degrees west, eighty two links, to the place of beginning.

22 Vt. 588, 1849 WL 2226 (1849) (emphasis supplied). The court noted the general presumption in favor of the center line: "reference to the course of the road, . . . may well be taken to mean the centre line," *id.,* but declined to apply it. "The line of a road, in reference to adjoining land, is universally taken to denote a side line, unless something appear, which clearly shows it to be otherwise." *Id.*

Similarly in *Maynard v. Weeks,* the court interpreted a deed conveying a parcel described as "Beginning on the *west line* of Vermont & Canada railroad and southeast corner of land *west* of said railroad, owned by said Philo Weeks. Thence south on the *west* line of said railroad twenty-eight rods. Thence west, etc." 41 Vt. 617 (emphasis added). The court found that "[i]t would have been difficult for the parties to have expressed more clearly an intention to bound the land conveyed on the west line of the road and not upon the center line." *Id.*

In *Buck v. Squiers,* the court interpreted a deed conveying a parcel of land described as

Beginning at the intersection of the road from Chelsea to Allen's saw mill and the branch on which the saw mill stands on the northerly side of said branch and nearly opposite my now dwelling house; thence *on the easterly side of said road* until the said road strikes the bank of said branch; thence down said branch, in the middle of the channel, to the first mentioned bound.

22 Vt. 484 (emphasis supplied). The court found that the deed did not convey to the center line; instead, it held that "[i]f the description be of land lying on the east side of a road, it must be construed to lie entirely on the east side of such road." 22 Vt. 484. Thus, in *Buck, Cole,* and *Maynard,* the Vermont courts acknowledged the center line presumption, but declined to apply it in the face of what they determined were unambiguous intentions not to convey any interest in the abutting highway or railroad. *See also Abraham v. Dougherty,* 115 Vt. 71, 51 A.2d 133, 134–35 (1947) ("Although a conveyance calling for the side line of a . . . highway as a boundary has . . . been construed as including the . . . highway to its center, generally such an instrument is held to limit the grant to the side line, in the absence of language or circumstances indicating a different intention.").

Vermont has also codified a center line presumption which comes into play upon abandonment of a right-of-way:

If the discontinued highway is not designated as a trail, the right-of-way shall belong to the owners of the adjoining lands. If it is located between the lands of two different owners, it shall be returned to the lots to which it originally belonged, if they can be determined; if not, it shall be equally divided between the owners of the lands on each side.

19 V.S.A. section 775 (2002). *See also Dessureau v. Maurice Mem'ls, Inc.,* 132 Vt. 350, 318 A.2d 652, 653 (1974) ("The taking, pursuant to statutory authority, gave the railroad only an easement, not a fee, and upon abandonment, the property reverts to the former owner."). We take this provision to mean that the first inquiry upon abandonment is, "who owned the underlying fee?" If there is a ready answer to that question, there is no need to resort to a division between adjoining owners. If it is not possible to trace the ownership, then the law, in an effort to eliminate gores, simply divides between adjoining owners.

We think that the proper construction, consistent with the Vermont decisions and law cited above, is to limit the House to Miller grant to the land east of the right of way. The terms "to the Rail Road" and "East of said Rail Road" might be sufficiently general to permit application of the normal presumption. The critical phrase, however, is "along the enclosure of said Rail Road." Websters defines enclosure as "an enclosed place or area." Webster's New World Dictionary (1988). The word of necessity acknowledges the existence of a two dimensional space which has an outer edge.

The center line presumption thus does not apply and at the time of the Miller conveyance, the Millers did not obtain any interest in the right-of-way. We note also, that, because House owned all of the adjoining land, including land supporting the easement, there was no need at that point to allocate an orphan gore. This holding, we believe, is dispositive, at a minimum, of plaintiffs' claim to the lake parcel west of the center line. Land does not convey unintentionally. If the land underlying the right-of-way did not pass by deed to the Millers, then plaintiff's argument concerning an unbounded right-of-way to the west also fails. The fee remained in House. We believe this fact is also dispositive in all other respects of plaintiffs' claims, as will be seen below.

With respect to the 1868 conveyance to the railroad, plaintiffs contend that, irrespective of how the deed is phrased, House had already conveyed the lake parcel to the Millers, and thus could not convey it to the railroad. We believe, as explained above, that this is incorrect as a matter of law. Plaintiff alternatively argues that the 1868 deed is ambiguous and thus susceptible of the center line presumption. When then compared with the 1867 conveyance, it becomes clear, according to plaintiffs, particularly in light of the valuation maps showing the railroad's rights to be based on the easement and not the 1868 deed, that the House deeds intended to split the easement.

Defendant's construction of the 1868 conveyance is more catholic. It should be construed either as intended to convey to the center line or only from the western edge. Either way, CPRR was not directly granted a fee to the entire parcel under the easement. But it still possessed an easement. It is simply not clear whether the parcel not owned in fee was the land under the entire easement, or the land from the eastern side line to the center line. Although we believe that the language of the deed is more compatible with an intent to grant to the center line,[1] we agree that it is immaterial to plaintiffs' claim, in view of our holdings above.

Defendant claims that, assuming, *arguendo*, the 1868 House to CPRR deed did not convey fee title to all or any of the land already burdened by CPRR's easement-and that there was a subsequent abandonment of the easement under state law-then 19 V.S.A. section 775 would require that the road "be returned to the lots to which it originally belonged." Defendant claims that, as applied in this case, section 775 would require the right-of-way land to be joined to the parcel retained by House after the 1867 conveyance to Miller, plaintiffs' predecessor. The land under the easement, in other words, never belonged with the Miller parcel. We agree with this as an alternative scenario. It is unnecessary to adopt it, however. It is unnecessary to determine who in fact owns the abandoned strip, so long as it is not the plaintiffs.

As a final matter, we address plaintiffs' contention that their parcels extend to the lake because of the lack of any CPRR land "west" of the railroad at the lake parcel. This argument also depends, of course, on the assumption that the House to Miller deed extended to the center line, an assumption we reject above. The argument fails for other reasons. At the time of the 1867 deed to the Millers, the Houses kept the fee, at a minimum to the land underlying the western portion of the right of way, including the lake parcel. Plaintiffs' argument that there was no "land" west of the railroad is simply incorrect. It was retained by the Houses, at least until 1868. This essential characteristic would not have changed in 1868. If the property deeded in fee to the railroad extends to the center line, a construction we believe to be correct because of the generality of the deed, *see supra* note 3, then there was indeed a fee interest in land "west" of the railroad. It was the land underlying the right of way itself. The center line presumption means that the entire parcel transferred includes land to the center line. That portion is not something less than a fee interest.

This construction, *viz*, that the railroad got a fee interest in the lake parcel, at least west

---

1. The grant refers to land "west of the Rail Road to the lake." This would appear to be the type of phraseology which uses the railroad as a generic, orientating border, construed by the courts as subject tithe center line presumption.

of the center line, is more consistent with the apparent intent of the 1868 deed, and is certainly consistent with the modern deeds. If we assume that House wished to eliminate all interest in the lake parcel, an assumption consistent with the desirability of avoiding gore strips, then there would be a merger of the railroad's interests. The least reasonable construction of the 1868 deed is that the very portion of the right of way designated for a "Flag Stop" and a "train platform" was the only land west of the track not owned in fee by the railroad.

In this respect, we do not agree with plaintiffs that the 1914 railroad valuation maps are strong evidence that the railroad obtained no fee interest in the lake parcel in 1868. The purpose of such maps was to identify parcels for valuation, not to distinguish types of ownership. The easement preceded the fee interest. Short of devising a hybrid designation of areas covered initially by easement and then by fee, the map originators would have had to show a break in the easement in the stretch obtained from House. There would have been no obvious reason for such a distinction, thus the court attaches little significance to the colorations on the valuation map.

Defendant's analysis admittedly leaves room for the possibility that there is a gore underlying the eastern half of the right of way. It attempts to dispose of this by invoking presumptions against such unclaimed parcels which would dictate reattaching that strip to the dominant chain of title (House). It is unnecessary to resolve that issue in this suit. It is sufficient to conclude that the plaintiffs have not established title to any of the parcel allegedly taken.

## CONCLUSION

Plaintiffs' claims of a taking cannot succeed due to failure of proof of an ownership interest. Accordingly, defendant's motion for summary judgment as to this group of plaintiffs is granted. The parties are directed to consult to prepare a status report, to be filed on or before August 23, 2002, proposing further proceedings in the balance of this action.